STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN H. BOYINGTON, DEFENDANT-APPELLANT.

Monmouth County Court
Law Division (Criminal)

May 8, 1978.

*Mr. William E. Wilson,* attorney for appellant.

*Mr. Clinton E. Cronin,* Acting Monmouth County Prosecutor, attorney for respondent (*Mr. Charles J. Uliano,* of counsel).

WICHMANN, J. C. C. This matter was heard before this court on March 17, 1978. It involved testimony of a technical nature concerning the scientific reliability of the Decatur Ra-Gun. This hearing was on remand from the Appellate Division in the matter of *State v. Boyington,* 153 *N. J. Super.* 252, which directed this court, at the option of the State to present it, to hear scientific testimony concerning the machine's reliability and whether or not the Appellate Court would, pursuant to the *Rules of Court,* take judicial notice of this machine's scientific reliability.

A brief history of the events leading to this hearing follows. Defendant Boyington on April 5, 1976 was found guilty of speeding in the Borough of West Long Branch in violation of *N. J. S.* 39:4-98. The sole proof of the miles per hour of the defendant's vehicle was that presented by Patrolman Stahl who was using a radar-gun type of speeding detection device.

As a result of the testimony (the case being contested) defendant was found guilty of driving his automobile in a 25-mile-an-hour zone at 45 miles an hour. It was testified that it was a Decatur Ra-Gun speed detection device. The municipal court took judicial notice of the effectiveness of said device and found defendant guilty.

On appeal to the Monmouth County Court, *State v. Boyington,* Appeal No. 22-76, the conviction was affirmed. Defendant appealed to the Appellate Division of Superior Court.

On October 20, 1977 the Appellate Division in a *per curiam* opinion reversed the conviction for insufficient proof establishing the scientific reliability of the Ra-Gun and offered the State the opportunity, if said proofs were available, to show the scientific reliability of the Ra-Gun used to detect the speed in this case. The State did, on notice, accept the

offer and the matter was duly set down for trial, the hearing being confined to proofs concerning the scientific reliability of the machine and any opposing testimony which might be offered by defendant.

The State presented the testimony of Glenn DeVore, an electronic engineer presently residing in the State of Illinois who, prior to his retirement, was employed by Decatur Electronics, Inc., Decatur, Ill., the manufacturer of the speed detection device known as the Decatur Ra-Gun. At the time of this machine's development and production at Decatur Electronics this witness was engaged in the technical problems arising in its development and with other speed-detecting devices referred to as police radar circuitry.

This witness' qualifications include a Bachelor's degree in Engineering at the University of Illinois, and a Master's degree from Purdue University. Prior to his employment at Decatur he was employed for 20 years by the United States Defense Department, dealing largely with systems analysis relating primarily to radar-oriented equipment.

His years with the Defense Department included five years with the Army, four with the Navy and four with the Air Force at Wright-Patterson Air Force Base. His experience with Navy avionics during his years with the Navy was primarily as project engineer for prototype productions of fire control computers and X-band radar to control fire activities from Navy aircraft.

The defense offered the testimony of Bruce S. Bogner, who has a Bachelor of Science degree in Electrical Engineering from City College of New York, and a Master's degree from Brooklyn Polytechnic Institute. His qualifications also include being a senior engineer at RCA in Moorestown, N. J. He testified that patents have been issued to him dealing with the invention of a microwave antenna and a variation of it dealing with microwave power dividers.

A summary of the testimony of the State's expert dealing with the workings of the Decatur Ra-Gun and its scientific reliability follows.

The Decatur Ra-Gun is a hand-operated radar type speed detection device. It works upon the Doppler principle previously passed upon by our Supreme Court in *State v. Dantonio*, 18 *N. J.* 570 (1955). Its effectiveness in speed detection is its size and its ability to be operated on ordinary voltage obtained by a fixture inserted in the cigarette lighter of an ordinary police vehicle.

Within its components there is contained the miniature computer and circuitry necessary to compute speed and give a continuous reading on the machine itself registering digitally the speed of the vehicle approaching or passing. The computation is made within one-hundredths of a second.

The transmitting of the beam to the target vehicle may be made from the interior of the vehicle — that is, through the windshield. Opaque objects, such as metal, stone, wood and concrete, deflect the radar beam; transparent materials — glass and plastics — transmit it without interference. This machine transmits a microwave beam from the front end of the Ra-Gun and will receive the return microwave through a receiver or antenna at the front of the machine. The return wave as received travels through an amplifier to assist its reading within the computer, and upon entering the computer registers a speed.

The speed of a microwave is a known scientific fact, as is the speed of a radio wave. The purpose of the computer within the machine is to compute the received variance from an object that is stationary and one that is moving. This mathematical computation registers and reads out to the officer using the device. Its principles, according to DeVore, expert for the State, are the same established principles used in radar-type speed detection devices heretofore used. The mathematical computation and equation as to the speed on return of the microwave is the same, and it is the same used in all of the most sophisticated radar equipment utilized by the military both for rangefinding and homing type devices. The use of the microwave with the known scientific equation of its characteristics is apparently unlimited.

This machine is designed to calibrate vehicles moving away from the beam as well as those moving into the beam. Again it. is a question only of computing within the machine itself. This Ra-Gun is used by the officer while the police vehicle is in a stopped position.

It is interesting to note that this witness indicated that Decatur has designed and is selling on the market a similar type speed-detection device, hand-operated, which may be used by a traffic officer in detecting the speed of a vehicle being pursued while the police vehicle is in operation. The computer is more refined and one further step in the use of the gun is taken. Again, however, it works upon all of the same principles.

When questioned about the scientific reliability of the read-out of the Ra-Gun under consideration here, the witness stated that on the basis of 1,000 being perfect, this machine's accuracy is 990, or 1 mile, plus-or-minus, per 100 miles an hour.

As to the question of receiving an improper or inaccurate return microwave, the machine is so computed that if there is not a sufficient quantity of return microwave received there will be no readout. If within the machine the antenna receives sufficient return of the transmitted and returned microwaves, the reading will be accurate. There can be no false reading. In other words, there will be an accurate reading or none at all.

Any solid portion of the moving vehicle coming into contact with the microwave will transmit a sufficient return to produce a reading. Rain or heat emanating from the road will not in any way affect the microwaves. If, again, there is sufficient return of the microwaves to produce a reading, the reading will be accurate within — in the expert's opinion as to the rating of the machine — plus-or-minus 1 mile an hour per every 100 miles an hour.

The testing of this device prior to use is done by dual means. Within the machine itself to determine that all cir-

cuits are working there is a button which is pressed and is calibrated to 60 miles an hour. If the light registers and the reading is 60 miles an hour, the machine is properly functioning. In addition thereto the machine is distributed with two tuning forks which are manufactured at five miles an hour variances. The use of the tuning forks is to transmit a wave which is received within the receiver and computes to a readout in speed of miles per hour. As to the accuracy of the tuning forks and their potential to develop some form of metal strain which might produce an inaccurate reading — that is, a tuning fork calibrated for 55 miles an hour might not read 55 miles an hour — this witness testified that the tuning forks as manufactured, regardless of use or misuse, have never in his opinion and experience given an inaccurate reading, nor could they by being struck too forcefully produce some form of harmonics which, again in theory, might produce a vibration different than that for which it was calibrated.

The manuals recommend, according to the witness, that the tuning fork be struck on a soft rather than a hard object, but this witness testified that in either event the tuning fork would be consistent with its manufactured miles per hour designation.

In regard to the handling of the Ra-Gun by the operator and the training of the operator, this witness felt that 30 minutes of instruction — although he concedes more instruction than that is given by the company to trainers — is sufficient. Basically, operation consists of plugging in the machine, aiming it and taking the reading registered on the readout picture. He further stated that the instructional course as given is of such a nature that once received by a reasonably intelligent person and used by him successfully, he can instruct other officers within the department in the use thereof.

This court finds, as stated in *State v. Dantonio, supra* at 573, that it is not necessary that the operator of the radar

equipment be an electrical engineer or have some other special technical skills.

It appears to this court that the attractiveness of the use of this device for the obvious necessity of detection of speed on highways today is its simplicity of use, its size and the fact that it is a device which may be operated by an individual officer within his own police vehicle without additional help.

The court finds that the use of this device requires sufficient training so that the officer is capable of accurately aiming it in the proper direction and, as indicated in the manual, aiming it along the side of the road rather than the middle.

The testimony of the expert witness produced on behalf of defendant basically argued all of the characteristic defenses raised in prior radar cases dealing with other types of earlier machines operated under the Doppler principle, such as: Is it the reading of the defendant car; is it a combined reading of both the defendant car and another vehicle, and does it have the potential of being affected by bad weather, rain or heat?

This court accepts the testimony of the State's expert hereinbefore set forth as it relates to the elements or other conditions affecting the reading. As to the question of whether the reading taken was from the proper car, this court feels that this is a proper subject for cross-examination but does not affect the scientific reliability and accuracy of the Decatur Ra-Gun.

Accordingly, from all of the testimony presented, including the manual distributed by Decatur Electronics, Inc., this court accepts the Ra-Gun as scientifically reliable and accurate in speed detection of vehicles, its accuracy being up to 1 mile plus-or-minus per 100 miles an hour.

It further finds from the testimony of the State's expert witness that the training of the officer who used the device, in light of its designed simplicity, was sufficiently established.

The court finds the defendant guilty of speeding and imposes fine and costs as heretofore imposed by this court in its original judgment of conviction on appeal dated November 19, 1976.