170 N.J. Super. 44 (1979)
405 A.2d 477
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DOUGLAS WOJTKOWIAK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Law Division (Criminal).
August 2, 1979.
*45 Mr. George Ciszak for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
Mr. Allen Etish for appellant (Messrs. Greenberg, Shmerelson, Weinroth and Etish, attorneys).
WELLS, J.S.C.
This is an appeal from defendant's municipal court conviction for speeding 68 m.p.h. in a 55 m.p.h. zone. At the request of defendant, and with the State's consent, the court opened the record below for the sole purpose of determining the scientific reliability of the K55 Radar Speed Detection Device. Defendant's conviction rests on a speed reading displayed by the K55 in State Trooper Albert J. Dempster's troop car as he and defendant approached one another, Trooper Dempster in a northbound lane and defendant in a southbound lane, on Route 295.
Because defendant, unrepresented below, did not raise it, and because both defendant and the State, on this appeal, advised the court that questions about the reliability of the K55 were affecting the administration of justice in the municipal courts, the court believed limited reopening of the record was warranted. R. 3:23-8(a) authorizes the appellate court to hold a "plenary trial de novo without a jury" where "the rights of defendant were prejudiced below." Because prejudice to defendant could only have arisen from the municipal judge's unchallenged assumption of reliability of the K55, the trial de novo is limited to that issue. All other matters will be decided on the record below.
Further authority, by analogy, is found in two recent instances in which the Appellate Division, itself, returned cases to the *46 trial court for plenary hearings on the scientific reliability of devices used in law enforcement. State v. Hibbs, 123 N.J. Super. 108 (App.Div. 1972), on remand 123 N.J. Super. 152 (Cty.Ct. 1972), aff'd 123 N.J. Super. 124 (App.Div. 1973); State v. Boyington, 153 N.J. Super. 252 (App.Div. 1977).
The legal criteria to be applied in admitting scientific evidence are well established. Before the results of any scientific test may be admitted in evidence it must be shown that the equipment or the methodology used has a high degree of scientific reliability and that the test is performed by qualified persons. State v. Chatman, 156 N.J. Super. 35, 38 (App.Div. 1978).
Speed-measuring radar in various forms has been accepted since State v. Dantonio, 18 N.J. 570 (1955). See State v. Overton, 135 N.J. Super. 443 (Cty.Ct. 1975) (Mark VIA), and State v. Boyington, 159 N.J. Super. 426 (Law Div. 1978) (Decatur Ra-gun); State v. Musgrave, 169 N.J. Super. 204 (Law Div. 1979) (K55 Speed Detection Device held reliable). This last decision is, of course, entitled to, and has received, great respect as that of a court of coordinate jurisdiction, but it does not appear that Judge Wichman heard conflicting expert testimony and, accordingly, this court offers its opinion on the same issue to analyze the reliability of the K55 in light of expert criticism.
Four experts, two called by each side, testified. In addition, the State called Trooper Dempster. The State's witnesses were principals of MPH Industries, manufacturer and distributor of the K55. The first witness, Robert E. Patterson, who built a crystal radio at age 10, is "entirely responsible for the total technical design and construction and manufacture of the K55 radar." He is a high school graduate with two years of college, graduated from the Army's Signal School at Fort Monmouth and ended his military career as head of maintenance of school equipment at the Missile Guidance School at Redstone Arsenal. This military career gave Patterson extensive theoretical and *47 practical knowledge of radar of all types. Patterson, after his military discharge, held successive jobs as chief electrical engineer at several companies in the electronics and radar industry in each of which degreed engineers reported to him. He holds five patents in various types of electronic circuitry design and built the first solid state cardiac monitors; he has also designed or contributed to the design of music amplification equipment, police radar (before the K55) and cardiac telemetry equipment. These devices depend on a common thread of theory and practical technology applicable to radar-informed speed measuring equipment and, in several instances, Patterson was in the forefront of the developing technology which finally emerged in various speed measuring radar devices.
The second State's witness was Edward Walker Sergeant. His qualifications are detailed in State v. Musgrave, supra. In this case Sergeant testified solely about the training programs offered by MPH, and, in particular, about the one he gave to a class of New Jersey State Troopers among whom was Trooper Dempster.
The defense's experts were Andrew L. Soccio and Dr. Leo Nichols. Soccio's qualifications are outlined later in this opinion. Dr. Nichols possesses a B.S. in Electrical Engineering from Virginia Military Institute, a Master of Science in Electrical Engineering from Ohio State and a Ph.D. in the same subject from Virginia Polytechnic Institute. Although Dr. Nichols holds a license as a professional engineer in Virginia, his primary profession is that of teacher, having risen from an instructor to his present position as head of the Department of Electrical Engineering at Virginia Military Institute, a job he has held for 11 years. He has taught basic electric circuits, thermodynamics and microwave theory and techniques. He has testified as an expert many times in several states on the theory and operation of traffic radar.
It is from the testimony of these witnesses, and Trooper Dempster, that the court makes its findings on all aspects of the *48 theory and operational characteristics of the K55 and, finally evaluates its reliability.

Principles of Doppler Radar
It is necessary to review certain basic ideas in order to understand the K55 and to describe its limitations.
Engineers generally depict radiant energy as moving in an undulating wave form pattern called "cycles." The number of cycles passing a given point in a given period of time is called "frequency." In music, the frequency at which sound reaches the ear determines the pitch people hear. Middle C on the piano, for example, when played, produces a sound wave at a frequency of X cycles a second, and the C one octave above middle C will generate a sound wave at 2X cycles a second. The higher the frequency, the higher the pitch will be. Note at the outset that this relationship between frequency and pitch is direct and not affected by other factors. For instance, it makes no difference how loudly or how softly you play middle C, or if you play it loudly and the octave C softly, the two sound waves produced will still reach the ear at the same frequency, X and 2X cycles a second. Nor does distance from the source of the sound make a difference. If a pianist in a concert hall plays middle C, that note is heard as middle C whether a listener is in the front row or in the last balcony row.
So far, we have considered a stationary source of sound waves. Let us now take a moving source. Assume a passenger at a station awaiting a train. Down track the train approaches at 50 m.p.h. The engineer blows his whistle, which sounds a single high-pitched note. The awaiting passenger will hear that single note slide up the scale or, as we have just learned, its frequency increases. This natural phenomenon, imparting the vaguely romantic wailing sound of approaching or receding train whistles, is the Doppler effect (or "shift") at an audible frequency. Note once again the strength of the source (i.e., *49 whether the whistle blows loudly or softly) or its distance from the listener has no bearing on the effect  the pitch will slide up the scale, regardless of these factors as the train approaches. Furthermore, by definition, the Doppler effect cannot be heard from a stationary source. The frequency changes only with movement of the source.
All radar, including the K55, transmit or broadcast high frequency microwave energy which emanates from the transmitter in the cycle pattern and "echoes" back to the source. Sound, of course, does this too, but the reflector must be quite large whereas, with microwaves, small objects can and do reflect them.
If either the source of the microwave transmission is moving or a reflecting object is moving, the Doppler shift occurs. Thus if a person sitting in the moving source could "hear" microwaves, he would note a change in frequency of the returning cycles: increased frequency if the reflector is moving toward him (as in the case of the road or an approaching car) and decreased frequency if the reflector is moving away. Physicists have measured the frequency change and expressed the measurements in one of those simple, elegant formulae to which all nature appears ultimately reducible:
 2vf
 f[dop] = ___
 c
where f[dop] is the frequency of the returning microwaves, v is the velocity (speed) of the reflector, f is the transmitted frequency from the microwave source and c is the speed of light. Since c is always constant and the transmitter sends out microwaves of a known f, the only variable in this formula is v. Note, once again, that distance between source and reflector is absent from the formula as is any factor for the strength of either the transmitted or echoed energy.

*50 Description of the K55  Its Implementation of Doppler Principles

The K55 unit is a small rectangular instrument which resembles a digital clock radio with switches, buttons and two windows on its face, one for patrol car speed and one for target vehicle speed. These readings appear as lighted, red digital numbers on a black background much as a digital clock or modern calculator. When no readings are being displayed, only the black background can be seen. The set is secured to the dashboard of the patrol car directly behind the steering wheel and can be readily seen either over or through the wheel. It is so small that it cannot obstruct the driver's vision through the windshield. The set can be plugged into the vehicle's power source in several ways, one of which is through the cigarette lighter, and it comes with an antenna and transmitter-receiver which is secured to the center of the dashboard.
The transmitter-receiver and antenna are constructed of standard components based on well known and accepted technology for the transmission and reception of high-frequency energy. The K55 does not use any experimental, new or patentable component or process in the antenna or transmitter-receiver. Every transmitter is factory-tested with instruments which derive their accuracy from the National Bureau of Standards in Washington, D.C. The transmitter-receiver has also been tested by an independent concern to verify that it transmits at the frequency assigned to enforcement radar by the F.C.C.
When the set is turned on and calibrated[1] it may be operated in two modes: stationary and moving.[2] Each mode may be *51 controlled in either manual or automatic position.[3] With the antenna pointed straight out the windshield over the imaginary centerline of the patrol car and the power on, the transmitter will emanate a large lobe of high frequency microwave energy down the road. The set may be adjusted to give audible warning of a motorist approaching in excess of a predetermined speed; but the warning signal is not a prerequisite to reliable operation. The machine displays readings continuously for speeds between 20 m.p.h. and 99 m.p.h.
As the patrol car moves over the road, the microwaves reflected from the road will arrive back at the receiver at a frequency, predicted by the Doppler formula, varying with the speed of the patrol car. Let us call that frequency, frequency "X". Now assume a target vehicle approaches the patrol car. Microwaves reflected from the target vehicle will arrive back at the receiver at a frequency predicted by the Doppler formula varying with the sum of the speeds of both cars. Let us call that frequency, frequency "Y". Virtually by definition, frequency X will always be less than frequency Y. In the stationary mode only the high frequency "Y" is received and computed into a readable speed.
Thus, in the case of vehicles approaching one another ("closing") there are two returning frequencies, X and Y, both higher than the frequency originally transmitted, but Y always being greater than X. Because the transmitted frequency is constant, it can be dropped from further consideration and attention focused on the difference between X and Y, and they can now be called the low frequency (X) and high frequency (Y) returns.
We are now finished with the Doppler effect. All the rest of the K55 is devoted to processing the low and high frequency *52 return signals into a readable speed in miles per hour of the patrol car and target vehicle. But review what has been accomplished: Because of a single variable, speed, in one case relative to the road and, in another case, relative to a closing vehicle, two completely distinct frequencies have been generated, which can be computed into the speeds that generated them.

Description of the K55  Signal Processing & Digital Units
The high and low frequency returns from the receiver flow into the signal processing and digital unit of the K55. A precise technical description of the components and circuitry of the signal processor would take hundreds of pages, but the court finds that all of its individual components are standard and used in the K55 within their respective design limitations. The components are manufactured by reputable concerns such as RCA and Texas Instruments and are available generally on the wholesale or retail market for a wide variety of uses in electronic circuits, from radios and pacemakers to satellite telemetry. They all have known and accepted parameters of performance and durability in the industry.
Although the exact combination of components comprising the circuitry of the signal processing unit may be unique to the K55 (in one case a patent is pending with respect thereto), the overall circuitry design is also within industry-known, and accepted, electronic theory and practice. Neither the function nor the efficiency of any component is frustrated by its particular use or placement within the design of the signal processing unit.
The signal processing unit has ten functions, all of which it performs more or less simultaneously and in milliseconds: (1) it amplifies the high and low frequency returns from the receiver; (2) it filters out frequencies resulting in patrol car speed of less than 20 m.p.h.; (3) it separates the signal into low and high *53 frequency channels of parallel design, and as to each channel, (4) it filters random frequencies (commonly referred to as "noise") from the Doppler frequency being returned; (5) it tracks and locks on the Doppler frequencies and verifies them as the frequencies to be computed into vehicle speeds and, in the case of the high frequency channel; (6) it passes the now clear and verified signal into a subtractor, and in the case of the low frequency channel; (7) it passes one part of the signal directly to a digital computer unit which computes and displays patrol car speed in miles per hour; meanwhile (8) it passes the other part of the low frequency signal into the subtractor where, (9) it subtracts the high and low frequency signals and (10) it computes and displays the target speed in miles per hour.
The processing unit sweeps through these functions so quickly that a newly computed reading arrives at the viewing window about 15 times a second. In the manual mode the reverification and computing process is continuous throughout the time and distance the vehicles are closing and thus permits the officer to lock in a reading manually when, in his judgment, the target has been properly identified and the reading stabilizes. In contrast, in the automatic mode, the K55 itself, automatically, locks in the first reading computed from a discerned signal. MPH does not recommend the use of this position and present State Police policy forbids it.
One of the most important overall operations of the machine that emerges from the ten-step process described above causes it to focus on or to tune to, precisely and automatically, the strongest frequencies being passed to it by the receiver. To use a mundane simile, also from the law enforcement field, the K55 acts like a well-trained bloodhound, who once given an example of the target scent, wants to, and can, filter out or discriminate between all the other distracting scents its nose senses and track the target scent. This simile, however, should not be misunderstood. The "strongest" signal to a radar may not mean the *54 fastest car. Thus, as we shall see, signal strength depends on proximity to the transmitter and thus a slower target may well dominate the radar to the exclusion of a faster, but more distant, target.

The Technical Challenge
After extensive direct and voir dire examination, Andrew L. Soccio was permitted to testify for the defense as a highly experienced technician in the field of electronic circuits. Soccio is not a physicist, scientist or engineer; he has not designed a radar-informed speed measuring device from scratch. But he is entirely familiar with electronic circuitry, the various components that comprise modern circuitry and the various methods common in testing such circuitry. Soccio can build a complex electronic circuit from a schematic diagram; he can analyze its function; test performance of that function and evaluate its performance. The court believes that in certain cases Soccio has the experience to design or redesign electronic circuitry to improve its intended function or increase its efficiency. After a wide variety of experience in various jobs in the electronics industry, Soccio opened his own business which is devoted to troubleshooting and repair of traffic radars in South Jersey. He has not, under contract or otherwise, serviced the K55.
Soccio's qualifications did not include extensive or intimate knowledge of the K55. He disassembled one in Florida this winter and examined certain parts of its signal processing unit for about an hour; he observed K55s in operation on police cars for about six hours, and he obtained and copied a partial schematic diagram of the signal processing unit issued by MPH to police departments for making repairs. Using this schematic, Soccio built, in his home laboratory, out of standard components, two elements of the circuitry in the signal processing unit and tested them. These elements were the "phase lock loops" and *55 related components used in the high and low frequency channels. (See step 5, pages 52-53, supra). Based on these tests it was Soccio's opinion that the phase lock loops in both the high and low frequency channels possessed too wide a latitude in which to monitor and lock on an incoming frequency. Depending on minute transient errors in voltage, the phase lock loops operating in such a latitude could lock on a wrong frequency and pass it through to be computed.
Patterson, called in rebuttal, challenged both the design of Soccio's home-made circuits because the schematic was incomplete, and his tests because they were inadequate. It was his view that the overall design of components aligned after the phase lock loops in the circuit functioned together to nullify both the underlying assumptions of the Soccio tests and the test methods and equipment used.
Thus was framed the most important and difficult single issue in this case: to believe the architect of the K55 or the technically astute opposing witness. After due consideration the court is satisfied that the Soccio tests do not raise a reasonable doubt as to the technical capability of the signal processing unit of the K55 to turn the high and low Doppler frequencies into accurate readings of patrol car and target speeds. The court is not satisfied that there was sufficient similarity in all necessary respect between the Soccio prototypes and the actual, complete circuitry of the K55. Furthermore, the court does not believe the test methods used by Soccio were sufficiently accurate to ground the broad opinion he gave on the K55's potential for displaying undetected, erroneous readings to a reasonably skilled operator.

The Operational Challenge
The operational challenge to the K55 was grounded in the testimony of Dr. Nichols. He highway-tested the K55 in both Ohio and Florida for about 20 hours altogether. On these occasions, accompanied by others, he operated the K55 himself *56 and observed others do so. All the participants were civilians with engineering training and experience. No K55-trained policemen assisted, nor had anyone performing the tests received training from MPH. In at least one instance the test was financed by Fuzzbuster, a manufacturer of traffic radar countermeasures.
In Florida six makes of radar were operated in a single vehicle, calibrated and tested for interference with internal noises such as generators, fans and the like. Then the vehicle, with the radars switched on in pairs, was driven on randomly selected highways in Miami and its environs. No written record of the tests were made, nor were any targets of known speed run through the radars. The radars were operated in both stationary and moving modes and in manual and automatic positions. Based on this experience and his own academic background Nichols' thoughts fell into four general problem areas: (1) problems of target identification where there were several possible targets approaching; (2) problems of cosine error resulting in computation of lower-than-actual patrol car speed; (3) problems of internal and external mechanical, radio or microwave frequency interference, and (4) problems of a subjective nature. In all of these areas the K55 seemed to be most prone to potential error where it was switched to the automatic position.
Dr. Nichols identified two sources of difficulty relating to target identification. Both problems arise from the necessity to decide which of several possible targets is actually generating the speed readout.
As indicated on pages 53-54, one of the design characteristics of the K55 is to track, hold and verify the strongest frequency being echoed to it. In practice, the strongest return frequency is usually that which is closest to the receiver. Thus, MPH in its Operator's Manual directs:
Care should be taken by the operator that he recognize the violator is traveling at a higher rate of speed than the norm, that the vehicle is out in front, by itself, nearest the radar. [Emphasis supplied]
*57 But Nichols testified that a large target, rather than one closer to the patrol car, may actually be reflecting the strongest signal. Thus, if a truck is following a Volkswagen the K55 may compute the truck's speed rather than the Volkswagen's, contrary to the above-quoted identification rule. He also pointed out that some materials and shapes are better reflectors than others and could result in a more distant target, producing the reading, if made of such materials or in such shapes.
The court is satisfied that this problem could and probably does occur in a very close-following situation, and policemen should be alerted to the possibility of an incorrect identification. But Dr. Nichols gave no guidance whatsoever as to what was "close following." He apparently could not and did not say whether at 50 feet, 25 feet or at what distance between the approaching truck or Volkswagen, the rearward truck would begin to produce the stronger signal. Thus, the court finds the above-quoted rule a reasonably reliable guide on which to base identifications in the situation described.
Dr. Nichols also sought to describe target-identification problems where a possible violator was closer to the centerline of the transmitted microwaves than a target nearer in distance to the transmitter. He (as well as other witnesses) described the imaginary extended centerline of the patrol car (with the antenna so aligned) as the line of maximum transmitted power, and suggested that a return signal along that line would also be strongest. He pointed out that signal strength falls off far less as one moves away from that centerline than it does as one moves away from the transmitter. It has been found that one-half of the energy transmitted lies within an angle of 8° on either side of the centerline and, Dr. Nichols estimated, if the sides of that angle are carried out as much as 1500 feet from the patrol car, 85% of all the transmitted energy would lie within it. According, to Dr. Nichols, therefore, a target physically closer to the centerline, but more distant from the patrol car than the target nearest the patrol car, might produce a reading. An *58 unwary policeman might attribute that reading to the vehicle closest to the patrol car, thus resulting in an unjust arrest.
But Dr. Nichols' views in this respect were unsupported by any precise measurements or detailed tests. None of his highway tests was performed under controlled conditions. No experimental results or theoretical models were adduced to demonstrate Dr. Nichols' theories, to any degree of scientific probability, that a nearer target would produce a signal less strong than a more distant one, notwithstanding such distant target's proximity to the centerline of the micro-move-energy lobe. In fact, in most situations presented him, Dr. Nichols appeared to believe the nearest vehicle to the patrol car would generate the reading. Because it is true that signal strength (not frequency and hence not accuracy of a reading) falls off by the square of the distance from the transmitter, the court finds it more probable that that distance is, in fact, the key one, and therefor, once again, finds the quoted rule of identification reasonably reliable.
Dr. Nichols described cosine error as that error in target speed, which results from the fact that the Doppler frequency reflects along the line between the target to the patrol car, whereas the target is actually moving, not straight at the patrol car, but at an angle to it. Because of the trigonomic function of the cosine, which is always less than 1, the error always favors the target, i.e., displayed target speed is less than the actual target speed. But Dr. Nichols also theorized cosine error could reduce the display of patrol car speed. This is, potentially, a serious matter since reduced patrol car speed would result in false, higher target speed readings. Thus, if a huge sign or a long building with a long reflective surface on the side of the road reflected a signal stronger than that of the road and thereby generated the low frequency return for computing the patrol car's speed, the angle of such an object relative to the motion of the car might theoretically reduce the patrol car's speed reading by the cosine error.
*59 However, the court determines such situation would be necessarily rare, and the reading generated, transitory. Moreover, an alert officer, checking his patrol car readout against him speedometer, should note dropping speed and reject any target speeds obtained in that situation. Accordingly, the court determines that while cosine error as it affects patrol car readout may be a theoretical problem, its significance in routine traffic situations is not such as to raise a reasonable doubt as to the reliability of the K55 when operated by a trained and experienced officer.
Dr. Nichols also testified to internal and external sources of interference with the K55 which can produce spurious speed readings. The K55 possesses circuitry designed to filter out most internal and some external interference. Like all radar devices, the K55 can, and does, receive signals other than that which it originally transmitted. A wide variety of devices in relatively common use transmit electromagnetic energy at frequencies at or close to those assigned by the F.C.C. to police radar. Depending on the strength of these signals, which again depends on how close the source is to the K55, a speed reading can appear.
The signal processing unit may itself reject the signal and cause the reading to go blank, or the reading will be erratic, or so high or low as to tip the operator off at once that electronic interference may be present. Nonetheless, troopers are trained not to use their own radios when patrolling for speeders and to be mindful of the use of CB radios in the vicinity of the patrol area. Airports and even low strung high tension wires may also be common trouble spots. State and local police may well be advised to begin to catalog, within their respective jurisdictions, the existing sources, strength, frequency, range and direction of radiated energy which might intersect with or flow over the roads and highways. Armed with such information, tests could be run to determine the effect, if any, on the K55.
By so suggesting, however, the court does not wish to leave the impression that external radio or microwave interference *60 seriously detracts from the reliability of the K55. The court is satisfied that the chance of an undetected interference increasing a speed reading, to the detriment of a motorist, is so remote as not to raise a reasonable doubt under the "high degree" of reliability standard here at issue. Absolute perfection, of course, is not required.
As a result of his Florida tests, Dr. Nichols expressed certain subjective reservations about the K55. He expressed concern over the practical difficulties of target identification in the multiple-lane, heavy traffic situation, and surprise at the variety of response times in the various radars and the differences between them in the speed with which they repeated their readings. He stated the K55 did not give him "the personal satisfaction that it was as stable and as reliable in the quickness with which it reached a reading that seemed to satisfy the physical situation as the others." He also stated, "it seemed to be more erratic to me. It went up too far or down too far. The swings were more violent. Ultimately it would stabilize and come back and give an adequate and satisfactory reading."
Considering the qualifications of Dr. Nichols, these observations are entitled to respect. In fact, to the extent he notes that the K55 did come to an "acceptable" reading as compared with other radars, he points to the sensitivity of the K55 in the manual position in rejecting spurious readings or other transitory phenomenon. Since Dr. Nichols was as critical of the automatic position, with its ability to lock in a transitory reading, as Patterson, the court finds it difficult to understand his subjective feeling about the K55. In any event, such feelings do not raise a reasonable doubt in the court's mind as to the reliability of the K55 when operated in the manual position.

Ghosts and Shadows
Every law enforcement tool, whether it be a radar set or a bloodhound, must be understood and used within its inherent *61 limitations. The K55, as all radar, has such limitations. Transmitted signals echo randomly from anything the microwaves reach and sometimes that signal, echoed from a tree, fence or billboard, will a second time be reflected from a moving object out of the trooper's visual range and be received and processed as a speed reading. These are "ghost" readings  spurious speed readings of unseen vehicles or stationary objects. He who seriously reports tracking speeding trees with the K55 is either a fool or a knave, since such a report presents an inherent conflict with the underlying Doppler principle.
Such ghosts will be either so transitory or display such erratic readings that any experienced operator will at once recognize them. Moreover, ghosts will always be banished by a stronger signal because the K55 functions to find the lock on the strongest signal returning to it. Ghost readings cannot add to or detract from the speed of a real target. None of the experts challenged its reliability in that respect.
"Shadowing" occurs when the patrol car closely follows or is overtaken by a truck or large car with the K55 on in the moving mode. The signal usually returning from the road surface may now be temporarily supplanted by the stronger signal returning from the vehicle in front. Since that vehicle is traveling slower relative to the patrol car than the road was, the viewer will notice an apparent decrease in the speed reading of the patrol car. Any reading taken on a target vehicle under such conditions would be inaccurate.[4] But the evidence is clear that State Troopers are trained to check continually, while in the moving mode, the K55 display of patrol car speed with the speedometer. Any difference between the K55's reading and the speedometer is a trouble sign that will suggest caution on the part of the trooper in relying on a target speed reading.

*62 Training

The court finds that the operational reliability of the K55 is largely dependent upon the training and experience of the policemen who use it. In State v. Dantonio, 18 N.J. 570, 573-574 (1955), the court quotes a law review article stating that "the average person engaged in traffic control work can learn to use the radar speedometer after about one and one-half hours of instruction." Judged by that standard, the State Police get ample instruction in theory and practice on the K55. Trooper Dempster, for instance, received a full day of classroom and "hands on" practical instruction from MPH, Inc., representatives, and then "practiced" with the machine in his own patrol car 80 hours before he arrested violators. Such a level of instruction and experience acquaints the officers with the technical capability of radar as well as practical use in everyday traffic situations. For instance, like our bloodhound who cannot, having found the source of the scent, identify it as a vicious criminal or a lost child, so also cannot the K55 identify the speeding vehicle: the officer using it must do that. Troopers are taught a three-step procedure when the K55 displays a target speed: (1) identify the probable target producing the reading; (2) lock in the speed, and (3) compare visually the speed displayed with the officer's own estimate of the target's speed. This must be a complex procedure requiring well-coordinated eye and hand movement as well as the exercise of quick judgment. The officer must, also, be monitoring his own speedometer with that of the K55's readout on patrol car speed and driving his car with safety. With some traffic patterns, such as heavy approaching traffic in multiple lanes where no one car is clearly in front, it will always be difficult if not impossible to identify a target. But experience should quickly expose such situations.
In view of the above, however, and the high degree of skill and judgment required to operate the K55 reliably, it is the *63 court's view that periodic follow-up training be instituted in order to verify continuing qualification as a K55 operator. Moreover, the skill and judgment of troopers who themselves instruct in its use should be most carefully evaluated.
Finally, it is clear from the testimony of all the witnesses, that the K55 should not be operated in the "automatic" position in either the moving or stationary mode. That is present State Police policy and should remain so. By "automatic" in the sense used here, is meant that position on the K55 which "automatically" locks on the first echo it receives and processes that echo to a readout and will not then process further echoes. Thus may be instantaneously captured an interfering signal or a ghost which would not be reflected from the visible target.

Conclusion
For all the reasons stated above the court determines that a properly calibrated K55 Speed Detection Device installed in a car with a calibrated speedometer has a high degree of scientific and operational reliability when used in either stationary or moving mode, in the manual position by a person having at least three hours of classroom training and two to three hours of practical instruction together with some minimum experience prior to use in actual law enforcement. The court, on the record before it, cannot specify what the minimum experience should be but holds that 80 hours is, beyond doubt, sufficient.
When operated in the automatic position the operational reliability of the K55 is subject to greater question, and acceptance of readings while in that position must hinge to a far greater extent on detailed examination of the surrounding circumstances as well as the experience and training of the operator.
*64 In view of the holding above, the court will shortly schedule argument on any and all other issues defendant may choose to raise on the record below relevant to his conviction.
NOTES
[1] Calibration is accomplished with the use of two tuning forks, the accuracy of which must be the subject of documentary proof. Use of the K55 does not eliminate the need for such proof. Cf. State v. Overton, 135 N.J. Super. 443 (Cty.Ct. 1975).
[2] The "mode" of operation refers to what the patrol car does. In the stationary mode, the car is parked roughly parallel to the road directed at oncoming traffic. In the moving mode the patrol car operates in traffic and tracks vehicles approaching it in the opposite lane. All findings herein apply equally to both modes of operation.
[3] The difference is important and is explained in the text at pages 52-54.
[4] See, also, the discussion, at 58, regarding reduced patrol car speed as the result of cosine error.