STATE of Missouri, Respondent,

v.

Melvin Lewis HUNZIKER, Appellant.

No. WD 33130.

Missouri Court of Appeals,
Western District.

Aug. 24, 1982.

Lawrence R. Magee, Hines & Magee, Kansas City, for appellant.

Wm. N. Marshall, Harrisonville, for respondent.

Before KENNEDY, P. J., and WASSERSTROM and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from a judgment of conviction and imposition of a $15 fine for violation of § 304.010 R.S.Mo.1978. The judgment is affirmed.

Two points are presented which in summary charge the trial court erred in overruling appellant's motion for acquittal because (1) respondent failed to prove beyond a reasonable doubt all the elements of § 304.010 R.S.Mo.1978, and (2) respondent failed to prove appellant operated his motor vehicle in excess of the posted speed limit.

The record reveals a highway trooper was driving his patrol vehicle southbound on Missouri Route 7 at about 12:55 p. m., January 13, 1981. Near the intersection of Route 7 and Route TT, the trooper had occasion to check (by radar) the speed of an oncoming Lincoln automobile. The trooper testified he made a mental observation that the Lincoln was exceeding 55 m. p. h., but was proceeding at less than 70 m. p. h. The trooper then checked the speed of the Lincoln with his radar unit (described as a Speedgun 6) which registered an initial speed of 72 m. p. h. As the Lincoln slowed, the radar unit locked "in at a speed of 68".

In addition to the trooper, a technical shop engineer with the Missouri Highway Patrol testified. In summary, he stated he was trained and experienced to repair and certify radar units for accuracy. His qualification went unchallenged by appellant. This witness testified he certified as accurate the particular unit used by the trooper. These certifications are conducted on an annual basis. The witness testified the unit was accurate at the time of both tests. In addition to the unit, two tuning forks accompany the unit (one 35 m. p. h. and one 70 m. p. h.) and this witness testified he tested these two forks (the same ones used by the trooper) with a machine called a frequency counter. He testified both forks were accurate. The witness then explained that two forks are used in the field by the trooper the date he makes use of the radar unit to insure the unit is working properly. This is the field test he referred to as a secondary accuracy standard.

Under cross-examination this expert stated he did not personally know the condition of the unit operated by the trooper the day of the offense, but added he had checked the accuracy of the unit a few months before the offense and a few months after the offense. On both occasions, the unit was accurate. In response to inquiry, he stated that varied temperatures from below freezing to 130°–140° F would affect or change the unit less than one mile per hour. As to the tuning forks, the expert stated that unless their physical condition was changed (i.e., a part was ground away, etc.) their condition would not change. He testified the tuning forks were in identical condition as when manufactured. This witness also testified concerning the variation factor of the tuning forks (frequency) and stated it could be 15 plus or 15 minus per second. He further testified the radar unit allows for a variation of 31 before it would vary one mile in its readout.

Appellant testified he was northbound on Route 7. He was aware of the presence of the trooper because of CB reports and his radar detector. He stated the trooper showed him the 68 m. p. h. digital readout. In response to his counsel's question, "What did your speedometer show?" appellant responded "Probably around 56 to 57, no higher than that". Appellant denied traveling at 68 m. p. h. or 72 m. p. h. Through a series of questions and answers appellant intimated his speedometer was in proper working order but he offered no additional evidence to support this contention.

The evidence closed, the trial court found appellant guilty and assessed a fine of $15. This appeal followed.

Under point (1), appellant argues he was charged by information "under § 304.-010(2), R.S.Mo." and there is no such section. Appellant is correct but fails to observe that the complaint cites the correct section number. In addition, while Rule 23.01 prescribes an information shall

"... cite the section of the statutes alleged to have been violated ...."

there is another rule (Rule 23.11), which prescribes:

"No indictment or information shall be invalid, nor shall the trial, judgment or other proceedings thereon be stayed because of any defect therein which does not prejudice the substantial rights of the defendant."

■ Appellant's suggestion that the information referenced § 304.010(2) instead of § 304.010.1 is a suggestion without substance and there is no showing of prejudice to appellant, Rule 23.11, *supra.*

■ In addition, appellant asserts that the language of § 304.010 has been drawn in the conjunctive and as a result, respondent was required to prove not only that his speed exceeded the posted speed limit, but that there must be proof appellant operated his vehicle in such a manner as to endanger the property and/or person of another. This argument was rejected in *State v. McNail,* 389 S.W.2d 214, 219 (Mo.App.1965), wherein the court ruled:

"It would seem to us, however, that Section 304.010, par. 1, prohibits *both* driving in a careless and imprudent manner *and* driving at a rate of speed which endangers the property of another, or the life and limb of any person. Our statute does not in terms require a showing that any specific person be put in actual danger; rather, it has been said that the primary object of Section 304.010, par. 1, is to *prevent* danger and injuries on the highways. *State v. Ball,* supra, 171 S.W.2d at 793.... We consider it unnecessary for the State to prove that the life, limb or property of any specific per-son was actually put in danger in order to sustain a conviction of careless and reckless driving."

While *McNail* dealt specifically with a driver who was observed weaving his vehicle and not driving to the right of the road, this court nonetheless holds the rule in *McNail* equally applicable in cases where the charge is premised upon speed in excess of the posted speed limit and there is sufficient evidence to support a conviction of the charge. There is no merit to appellant's point of view (1) and it is ruled against him.

Under point (2) appellant charges that respondent failed to prove appellant operated his vehicle at a speed which exceeded the posted speed limit.

The evidence reveals a posted speed limit of 55 m. p. h. on Route 7 at the location of the charged offense. Appellant takes no direct issue with this fact, but rather centers his attack upon the contention that respondent failed to prove the radar unit was operating accurately. Appellant cites *City of Ballwin v. Collins,* 534 S.W.2d 280 (Mo.App.1976), which ruled (after citing prior authority) that the accuracy of the measuring device must be sufficiently shown before the radar reading is considered accurate. In *State v. Bollinger,* 550 S.W.2d 214, 215 (Mo.App.1977), the court ruled "... Here as in *Collins,* though an internal calibration and a tuning fork test had been performed, neither of the testing devices had been checked.... The court held, as we do here, that tests performed with devices whose accuracy had not been shown, would not render radar speed evidence admissible." See also *City of St. Louis v. Martin,* 548 S.W.2d 622 (Mo.App.1977), where the court ruled that the value of radar speedometer tests depends upon the accuracy of the measuring device by which it is checked.

Appellant contends that the tests for accuracy in the instant case are insufficient for two reasons. First, there was only a showing that the unit was tested at remote times, relative to the date of the offense,

and the tests for accuracy were made under circumstances differing from the tests made just prior to the use of the unit and its application relative to the offense.

■ As to the first challenge, appellant merely concludes that the testing for accuracy of the unit as of June 10, 1980, and again on June 15, 1981, although resulting in written certifications that the unit was accurate, were insufficient to establish its accuracy on the date of the offense of January 13, 1981. The testimony of the expert set forth in detail what procedures are followed which lead to a certification for accuracy. He also testified that in addition to an annual check, the unit could not be altered, extreme temperatures of below freezing to 130°–140° F would affect the unit at one mile or less per hour (these temperatures have no relationship to the actual weather conditions at the time of the offense, but on cross-examination challenge was made that temperature could affect the unit's accuracy) and that tuning forks are utilized to secondarily check the accuracy of the unit. The expert also testified upon cross-examination that the tuning forks were operating accurately. Appellant also seems to suggest that the respondent is required to prove the accuracy of the testing devices. This question has been ruled directly in *City of Kansas City v. Tennill,* 630 S.W.2d 173 (Mo.App.1982). There is no merit to appellant's first contention under point (2) above.

■ Appellant's second contention is that the accuracy test applied by the trooper on the date of the offense differed from that applied by the expert and was thus insufficient. This argument is premised upon the patrol vehicle being stationary when the test was made as contrasted with a 50 m. p. h. speed when the arrest was made. Appellant concludes that the accuracy of the radar unit was never established when the device was in motion. Appellant overlooks a portion of testimony by the trooper which we conclude dispels appellant's final conten-

tion. In addition to the trooper's testimony concerning the 35–70 m. p. h. tests with the tuning forks, the trooper testified he made those tests with his patrol vehicle stationary in both a *stationary mode* and a *moving mode* of the unit. The unit with the forks tested accurately in both modes. In addition, the trooper when asked ". . . When his speed crossed your radar which mode was it in at that time?" answered "Moving mode". The trooper further testified that while operating, the unit is constantly checked against the speed of the speedometer of his patrol vehicle and when the unit is "locked in" to check the suspect vehicle, both the ground speed of his vehicle and the speed of the suspect vehicle are locked in on the unit. In addition, the trooper testified the radar unit has internal calibrations which should read 31 when in actual use and this 31 reading must register in both the stationary and moving modes. The trooper testified the unit read 31 in both modes. This 31 reading was in harmony with the testimony of the expert on the tolerance range of the unit.

This court concludes the evidence was sufficient to establish the radar unit was operating accurately at the time of its use relative to this offense and that the evidence was sufficient to establish that the adopted testing procedures support a finding that the unit was operating accurately. There is no merit to appellant's second contention under point (2) above. Point (2) is found to be without merit and is ruled against appellant.

The judgment is affirmed.

All concur.