STATE of Missouri, Respondent,

v.

Brent Dee CALVERT, Appellant.

No. 66049.

Supreme Court of Missouri,
En Banc.

Dec. 18, 1984.

Rehearing Denied Jan. 15, 1985.

Kenneth J. Berra, Richmond, for appellant.

Farrell D. Hockemeier, Sp. Pros. Atty., Richmond, for respondent.

HIGGINS, Judge.

A jury convicted defendant Brent Dee Calvert of driving while intoxicated, section 577.010, RSMo 1978, and speeding, section 304.010, RSMo 1978. His punishment was fixed at fines of $500 and $100; judgment was rendered accordingly. A majority of the Court of Appeals, Western District, affirmed; the dissenters transferred the case to this Court, citing conflict with existing case law and the general interest and importance of the issue raised. The questions for decision, upon which the court of appeals divided, are whether the State established the scientific reliability of the radar speed device in question when operated in a moving mode, and the accuracy of the device when it recorded the speed of defendant's vehicle. Other questions are raised by charges that the trial court erred in admitting breathalyzer test results because the State failed to cooperate with discovery as required by section 577.020(4), RSMo 1978; in permitting the arresting officer to give his opinion of the speed of defendant's vehicle; and in refusing a proffered converse instruction. Affirmed.

On September 27, 1981, Sergeant Harvey Oberweather of the Missouri State Highway Patrol was patrolling a 55 miles per hour speed zone on Highway 13 north of Henrietta, Missouri, when defendant approached in his vehicle from the opposite direction. The sergeant was in an unmarked patrol car equipped with a Speed Gun Eight radar unit, a device designed to record the speed of traffic. The Speed Gun Eight, functional in both a stationary and moving mode, was switched to the moving mode. Sergeant Oberweather formed an opinion, based on observation, that the approaching car was traveling faster than 65 or 70 miles per hour; the Speed Gun Eight recorded the speed at 74 miles per hour. He testified to both his opinion and the radar reading. The sergeant changed direction and gave chase. Defendant stopped his vehicle in the middle of the highway. Defendant's appearance, demeanor, and the odor of alcohol on his breath, led the officer to conclude that defendant was intoxicated. Defendant admitted drinking but denied he was intoxicated or had been speeding. A breathalyzer test administered at the Ray County Jail showed defendant had .15 of one percent alcohol in his blood. Sergeant Oberweather arrested defendant for exceeding the speed limit and for operating a motor vehicle while intoxicated.

Appellant argues that the State failed to lay a proper foundation for admission of the radar speed gun reading of the speed of his vehicle. He challenges the admissibility of the 74 miles per hour recording because there was no expert testimony that the unit could accurately measure the speed of a moving oncoming vehicle when the unit is in a patrol vehicle moving in the opposite direction.

Sergeant Oberweather, a 15-year veteran of the Highway Patrol whose experience includes some 5,000 speeding arrests, described his formal training and practical experience with the Speed Gun Eight. James Smith, a Highway Patrol communications specialist, described his training as an expert and experience with radar speed guns; his qualifications went unchallenged. Their testimony showed that the Speed Gun Eight operates on the Doppler theory, and they described its implementation in the enforcement of speed limits by the use of radar. Smith explained:

"[The radar] sends out a high frequency radio beam down the highway and if it strikes a moving object the beam will be bounced back to the radar at a higher pitch. Say the beam struck a car doing 70 miles per hour, the outgoing signal would come back at 2200 cycles higher in pitch, and the radar has a calibrator that divides that to miles per hour and displays on the screen, and the beam strikes the pavement from the patrol car which gives the speed of the highway patrol car and the moving radar substracts (sic) the ground speed on the oncoming traffic and reads out, it displays..... One dis-

play gives the ground speed of the patrol car and the other the oncoming traffic." Oberweather testified that the Speed Gun Eight is capable of functioning in a stationary or moving mode, and in the latter, "when we are driving down the highway it will give us our speed as well as the oncoming vehicle...."

Courts first judicially noticed the Doppler principle for use in speed detection in 1955, and the scientific reliability of radar speed devices based on the Doppler principle has been recognized in Missouri since 1959. *State v. Graham,* 322 S.W.2d 188 (Mo.App.1959). Other courts and commentators have accepted as reliable moving radar devices that operate on the Doppler principle. *Village of Pemberville v. Dietrich,* 7 Ohio Misc.2d 48, 455 N.E.2d 727 (Mun.Ct.1983); *State v. Primm,* 4 Kan. App.2d 314, 606 P.2d 112 (1980); *State v. Wojtkowiak,* 170 N.J.Super. 44, 405 A.2d 477 (Law Div.1979), *rev'd on other grounds,* 174 N.J.Super. 460, 416 A.2d 975 (App.Div.1980); *People v. Donohoo,* 54 Ill. App.3d 375, 12 Ill.Dec. 49, 369 N.E.2d 546 (1977); Note, *Radar Speed Detection: Homing in on New Evidentiary Problems,* 48 Fordham L.Rev. 1138 (1980). *Contra People v. Conlon,* 109 Misc.2d 729, 440 N.Y.S.2d 831 (Dist.Ct.1981). The Western District earlier upheld a speeding conviction based on a speed reading registered by a Speedgun Six, the predecessor of the unit used here. *State v. Hunziker,* 638 S.W.2d 793 (Mo.App.1982). *See Wojtkowiak, supra,* 405 A.2d at 487 (affirming speeding conviction based on moving radar reading); *Donohoo, supra,* 369 N.E.2d at 548–549 (same); *State v. Shelt,* 46 Ohio App.2d 115, 75 Ohio Op.2d 103, 346 N.E.2d 345 (1976) (same). *See also State v. Hanson,* 85 Wis.2d 233, 270 N.W.2d 212 (1978) (courts in future cases may take judicial notice of reliability of moving radar device).

Under these authorities this record provides sufficient proof of the scientific reliability of the Speed Gun Eight to constitute a prima facie case for admission of its speed reading; there was no conflicting expert testimony.

■ Appellant also contends the State failed to prove the accuracy of the particular unit used. The proponent of radar evidence must prove the unit was operating accurately at the time of its use relative to the violation to sustain a speeding conviction. *Graham, supra,* at 196–197; Annot., 47 A.L.R.3d 822 (1973).

■ Sergeant Oberweather stated that the State Highway Patrol periodically checks the speed gun and returns the unit with a certification of accuracy if it is in proper working order; the Highway Patrol last certified this particular unit on June 16, 1981. Before using this unit in detection of defendant's speed, Sergeant Oberweather performed three different tests to check the accuracy of this radar unit. At the beginning and end of each shift, he tests the unit for accuracy in both modes with tuning forks calibrated to produce speed readings of 30 miles per hour and 70 miles per hour. There was testimony from James Smith to show the accuracy and proper functioning of the tuning forks employed. In addition, the sergeant testified that he utilizes the internal calibration within the unit to check its accuracy. The third test consists of checking the radar unit display against the certified speedometer of his patrol car. The sergeant conducted each of the above tests on the day of the arrest. The evidence does not show the results of the tuning fork tests.

Appellant would support his contention by citing *City of Jackson v. Langford,* 648 S.W.2d 927 (Mo.App.1983). In *Langford* there was no evidence of the time and place of testing, and the officer used only the two tuning forks to test the accuracy of the radar gun. Here, however, Sergeant Oberweather testified that he shuts off the unit if it fails to display the correct readings when tested with the tuning forks; and permissible inferences from his entire testimony are that the unit registered correctly in response to each check for accuracy, and that the radar speed gun registered accurately when tested. *See City of St. Louis v. Boecker,* 370 S.W.2d 731, 734 (Mo.App. 1963). Appellant's objection to the admissi-

bility of the radar evidence relates not to the results of the testing procedures but to the time and location of testing. Appellant cites *Boecker, supra,* and *State v. Weatherwax,* 635 S.W.2d 34 (Mo.App.1982), which condition the admissibility of radar evidence upon a showing that the arresting officer tested the radar unit at the site and near the time of the arrest. Both *Weatherwax* and *Boecker* involved the use of stationary radar, a distinction made by the Western Division majority.

In following *Boecker, supra,* decided 20 years ago, the court in *Weatherwax* recognized that the earlier decision required the site test to reduce the possibility that outside factors produced an inaccurate speed reading. 635 S.W.2d at 35. In the instant case, the arresting officer acknowledged the possibility of spurious readings and estimated their occurrence at not more than one-half of one percent. External interference, in the form of bridges or power lines, may affect the functioning of the unit. A distorted reading may also result from internal interference, such as the patrol car heater, air conditioner or radio. Smith testified that any distortion produced by power lines consists of transitory, "flash" readings, which the stronger signal from a target vehicle overrides. Oberweather testified that he never experienced external interference in the area where he arrested defendant. He further testified that the radar gun produces a reading if pointed directly at the heater or air conditioner in the patrol car; the gun was affixed to the dashboard of the patrol vehicle, facing forward, and not capable of being directed toward the heater or air conditioner unless removed. Both Smith and the officer stated that the police radio, if it affects the radar unit, blanks out the display screen. Smith testified that an officer's training alerts him to potential sources of interference, most of which cause an obviously false reading. The arresting officer testified that he was trained to determine the accuracy of the radar unit prior to its operation, and could recognize and correct for spurious readings.

Significantly, Sergeant Oberweather periodically compared the radar readings with his calibrated speedometer. This check decreases the likelihood that the unit will compute the target vehicle speed on the basis of an inaccurate estimate of patrol car speed. *See Hanson, supra,* 270 N.W.2d at 218; Note, *Radar Speed Detection, supra,* at 1161. This is not a case that raises the problem of identification of the target vehicle from amongst heavy traffic, nor is it a case where the difference between the cited speed and the legal speed limit is slight. The defense introduced no evidence that casts doubt on the inference, following from this testimony and the evidence of other tests performed, that the moving radar unit was functioning accurately at the time of defendant's arrest.

The foregoing testimony provided a sufficient foundation for the admission of the results of the radar speed gun evidence. The record in this case alleviates the concern that without the site test prescribed in *Boecker, supra,* "a radar unit could be set up in any location whether or not there were outside factors which would give an incorrect reading, and the prosecution would have no burden to show that the radar unit was operating properly at the site of the arrest." *Weatherwax, supra,* at 35. If a site test was clearly feasible with a moving radar unit, *see id.* at 38 (opinion of Pritchard, P.J., dissenting), the controlling principle of the earlier decisions was the requirement that the State prove the operational accuracy of the radar unit at the time of use. The State met this requirement.

■ Appellant also charges that the trial court erred in admitting breathalyzer test results. He claims that the State's failure to comply with section 577.020(4), RSMo 1978, regarding discovery barred admission of the test results. The statute provides, "Upon the request of the person who submits to a chemical test at the request of a law enforcement officer, full information concerning the test shall be made available to him."

The State filed the information against defendant in the Magistrate Division of the Circuit Court of Ray County on October 21, 1981. On December 3, 1981, defendant

filed three discovery motions, one of which cited section 577.020(4) and sought detailed information about the breathalyzer machine and related documents. The State made no response of record to any of the discovery requests; the case proceeded to trial before the associate circuit judge and a judgment of conviction followed.

Defendant sought and obtained a trial de novo before the circuit court. The case came on for trial on February 16, 1982, on an amended information filed that date. On the same day, prior to jury selection, defendant submitted a motion in limine in which he sought to suppress use of the breathalyzer test results based on the failure of the State to respond to the section 577.020 discovery request. The court overruled the motion, and it is this ruling now challenged.

Appellant does not claim that any particular evidence not disclosed by the State but presented at trial was material to his conviction or that any nondisclosure resulted in fundamental unfairness. Rather, he argues the statute imposes a precondition on the use of breathalyzer test results and a failure by the state to comply fully with the request by the accused for information concerning the test bars use of the evidence. Appellant cites *State v. Paul*, 437 S.W.2d 98 (Mo.App.1969), to support his argument.

Although *Paul, supra*, at 101, held that a failure to comply with section 564.441(4), RSMo 1959, predecessor of the current section 577.020(4), prevented the State from introducing evidence of the breathalyzer test, examination of the circumstances there presented supports a distinction between the cases. In *Paul, supra*, the defendant had written to the St. Louis Police Department in advance of trial seeking information about the test and the request had been refused on advice of a city prosecutor. Here, no request for information concerning the breathalyzer test was outstanding and unanswered when trial commenced in the circuit court on February 16, 1982.

The motion in question was a discovery motion subject to Rule 25.04. Rule 25.04 requires the motion to be filed in the court having jurisdiction to try the case, which must then take action specifying the material to be produced and the time and manner of disclosure. The motion was ineffective in the de novo trial in the circuit court; it was not renewed after trial before the associate judge, and thus was not presented to the court now having jurisdiction to try the case. *See State v. Charity*, 637 S.W.2d 319 (Mo.App.1982). The defendant there presented a discovery motion to the associate circuit court division, but was subsequently bound over for trial in the circuit court. In denying a claim of error charged to failure of the State to comply with the discovery request, the court held that no motion was outstanding because it was not presented to the court having jurisdiction to try the case. The court stated that neither the filing of a request in the associate division, nor of the transcript in the circuit court, constituted sufficient compliance with the discovery rules. *Id.* at 323.

Notwithstanding appellant's efforts to distinguish *Charity, supra*, a felony case, on the ground that felony discovery cannot begin on the associate level, the record shows that defendant's only requests for discovery were made at the associate circuit level, and he relied solely on the original and unanswered discovery motion throughout these proceedings. Despite ample time to do so, there is no record of any objection by defendant to the conduct of the trial before the associate judge before his discovery motion had been ruled, nor is there any indication that he ever secured a determination of his motion by the associate circuit judge, and in the circuit court proceedings, there is no indication that defendant made any effort to reassert a demand for the material. When he moved the circuit judge to suppress the evidence, he did not seek production by court order of the data and documents contended to be relevant to the breathalyzer test. On this record, the trial court did not err in overruling defendant's motion in limine and overruling his objection to the introduction of evidence obtained with the breathalyzer.

On the charge that the testimony of the arresting officer regarding the speed of appellant's vehicle was inadmissible, it is sufficient to recognize that opinion testimony on the speed of a vehicle from an experienced officer is admissible in a traffic case. *State v. Barker*, 490 S.W.2d 263 (Mo.App. 1973); *Kansas City v. Hill*, 442 S.W.2d 89 (Mo.App.1969); *Missey v. Kwan*, 595 S.W.2d 460 (Mo.App.1980), cited by appellant, provides no support for his argument to the contrary. *Missey* was a personal injury action arising from an automobile collision, and the court held the opinion testimony inadmissible because the officer testified as to the speed of the vehicles upon impact, based not on his observation but on the condition of the vehicles after impact and the statements of the parties. *Id.* at 462–463. The testimony of the officer in this case corroborated the evidence of the radar speed gun and so was harmless error at most. *City of Kansas City v. Tennill*, 630 S.W.2d 173, 175 (Mo.App. 1982).

The State's verdict-directing instruction stated:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on September 27, 1981, at or near M–13, 2.0 miles south of M–10, in the County of Ray, State of Missouri, the defendant operated a motor vehicle, and

Second, that he did so in excess of the speed limit of 55 miles per hour,

then you will find the defendant guilty under Count II of exceeding the speed limit.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Defendant's proffered converse instruction stated:

If you do not find and believe from the evidence beyond a reasonable doubt that on September 27, 1981, at or near Highway M–13, 2.0 miles south of Missouri

State Highway M–10, in the County of Ray, State of Missouri, the defendant operated a motor vehicle at a rate of 74 MPH in a 55 MPH Zone, you must find the defendant not guilty under Count II.

The "unless you so find" clause in the State's instruction does not in itself preclude a properly tendered converse instruction, *State v. Smith*, 485 S.W.2d 461 (Mo.App.1972), yet a defendant who seeks to include a converse must draft and submit a proper one. *State v. Orr*, 493 S.W.2d 374, 376 (Mo.App.1973). Where, as here, the proffered converse is incorrect, the trial court may properly refuse defendant's instruction. *State v. Drake*, 512 S.W.2d 166 (Mo.App.1974). In the absence of the offer of an accurate converse, the State's instruction in the form used here is sufficient. *State v. Caldwell*, 423 S.W.2d 738 (Mo.1968); *Drake, supra*, at 173.

The judgment is affirmed.

All concur.