STATE of Wisconsin, Plaintiff-Respondent,

v.

John A. KRAMER, Defendant-Appellant-Petitioner.

Supreme Court

*No. 79–1111. Argued November 25, 1980.—*
*Decided January 6, 1981.*

(Also reported in 299 N.W.2d 882.)

For the petitioner there were briefs by *Jerome F. Pogodzinski* and *Turner & Pogodzinski, S. C.*, of Milwaukee, and oral argument by *Jerome F. Pogodzinski.*

For the plaintiff-respondent there were briefs by *Bronson C. La Follette*, attorney general, and *Dorothy H. Dey*, assistant attorney general, with oral argument by *Albert Harriman*, assistant attorney general.

WILLIAM G. CALLOW, J. John A. Kramer (defendant) seeks review of a decision of the court of appeals which affirmed a judgment entered by the circuit court

for Juneau county, the Honorable Byron B. Conway presiding, convicting Kramer of speeding in violation of sec. 346.57 (4) (h), Stats.

Kramer was arrested for speeding on April 15, 1979, at 6:55 p.m. while traveling northbound on State Trunk Highway 80 in Juneau county. Using a Kustom Signal KR–11 moving radar device set in the moving mode, State Trooper Theodore Due recorded Kramer's speed at 67 miles per hour in a 55-mile per hour zone. The only witness to testify at trial was Trooper Due.

Due testified he had been a trooper for eight months and that his training in the use of radar devices included eight hours of training at the academy, two hours of radar training at his district headquarters, and one week of field training in the use of the KR–11 radar unit. He estimated that in his eight months as a trooper he used a KR–11 radar unit on the average of one to two days per week and had written two to three hundred citations based upon his use of the KR–11 type unit.

On the day Kramer was stopped, Due testified to having calibrated the radar device, using both the unit's own internal calibration system[1] and two external tuning

---

[1] Trooper Due described this procedure as follows:

"Q. Is there any procedure that you go through to check primarily the accuracy of the particular unit?

"A. Yes sir, there is, we run through an internal calibration check, on the KR 11 it runs through the numbers 1 through 9 to show all the lights are functioning correctly on the KR 11 on both the patrol and target screen window. 64 appears in the patrol vehicle screen and a CAL, for calibration, appears in the calibration and in the target vehicle screen, then reverses the procedure with the 64 in the target and CAL in the patrol, and then if you set the numbers in the center of the KR 11, 444, it will read 55, 16.2, with a 55 being in the patrol vehicle screen, and 16.2 in the target vehicle screen, showing that it has all the internal workings of the radar functioning correctly."

forks,[2] at approximately 5:58 p.m. and again at approximately 7:07 p.m., or approximately one hour prior to Kramer's arrest and then twelve minutes after the arrest. On both occasions the tests showed that the radar unit was operating properly. Due testified that, as the radar unit locked on Kramer's vehicle, the radar device registered the speed of Due's patrol car as 48 miles per hour. Due stated that the patrol car's speedometer at that time indicated 50 miles per hour which was consistent with a fifth wheel speedometer calibration made on May 17, 1979, indicating that "[a]t speeds of 30, 40, and 50, there is a minus 2 variation from the speedometer speed to the trackmeter speed."

At the close of the state's case, the defendant moved for dismissal. The trial court denied the motion, and the defendant was found guilty and ordered to pay a forfeiture. The conviction was affirmed by the court of appeals sitting in a one-judge panel pursuant to sec. 752.31(3), Stats.

In *State v. Hanson*, 85 Wis.2d 233, 270 N.W.2d 212 (1978), we recognized that, while the scientific prin-

---

[2] Due testified as follows regarding this procedure:

"*Q*. Do you have any other checks that you use in trying to make sure the machine is operating properly that you used on April 15th, prior to 6:55 p.m.?

"*A*. Yes, we have 2 tuning forks, one is a 35 mile per hour, the other is a 65 mile per hour. We put the radar in the stationary mode and we strike the 35 mile per hour tuning fork gently on the steering wheel, the wheel is padded so it doesn't chip the tuning fork, doesn't damage it. We strike it on the steering wheel, hold it in front of the radar antenna, received a reading of 35, then I did the same with the 65 mile per hour tuning fork, received a reading of 65, then I put it in the moving mode, and I struck the 35 mile per hour tuning fork, held it in front of the antenna, receiving a 35 mile reading in the target vehicle screen, then I strike the 65 mile per hour tuning fork and held that also in front of the antenna in conjunction with the 35 mile per hour tuning fork, while there I received a 30 mile per hour reading in the patrol vehicle, which is how it is suppose[d] to check out."

ciples which underlie radar speed detection may be of such accuracy as to warrant judicial notice, certain testimony must be elicited in order to ascertain whether those principles were properly or accurately applied in a particular case. Accordingly, we held that a rebuttable presumption of the accuracy of moving radar, capable of supporting a speeding conviction, exists upon testimony by a competent operating police officer as follows:

"1. The officer operating the device has adequate training and experience in its operation.

"2. That the radar device was in proper working condition at the time of the arrest. This will be established by proof that suggested methods of testing the proper functioning of the device were followed.

"3. That the device was used in an area where road conditions are such that there is a minimum possibility of distortion.

"4. That the input speed of the patrol car must be verified, this being especially important where there is a reasonable dispute that road conditions may have distorted the accuracy of the reading (*i.e.*, presence of large trucks, congested traffic and the roadside being heavily covered with trees and signs).

"5. That the speed meter should be expertly tested within a reasonable proximity following the arrest and that such testing be done by means which do not rely on the radar device's own internal calibrations." *Id.* at 245.

On review we must determine whether the testimony of Trooper Due satisfied the fifth *Hanson* criterion.[3]

The defendant argues that the fifth criterion was not met because the tests of the radar device conducted by Trooper Due did not constitute expert testing, and further because the tuning fork tests were not "means which do not rely on the radar device's own internal calibra-

---

[3] At the court of appeals the defendant also argued that the road conditions where he was arrested did not comply with the third *Hanson* criterion. The court of appeals concluded that the third criterion had been met, and the defendant does not pursue that issue before this court.

tions." In satisfaction of the fifth *Hanson* criterion, the defendant argues "that the only way that the device can be expertly tested is to be tested by a radar technician fully knowledgable [sic] about the internal workings of the device just as a breathalyzer set is tested at sixty (60) day intervals by someone other than a mere breathalyzer operator as provided for in sec. 343.305 Wis. Stats."

In this case the accuracy of the patrol car's speedometer was measured thirty-two days after Kramer's arrest by use of a trackmeter fifth wheel device. Trooper Due's testimony described the trackmeter certification procedure, and the speedometer certification cards issued by the trackmeter technician were introduced as exhibits. At the time of Kramer's arrest, the speedometer registered a speed consistent with the speed shown on the radar device. We believe the combination of the trackmeter certification and the patrol car speed verification by using the "verify" button on the radar device is the equivalent of the periodic breathalyzer-type testing by someone other than the operator. We do not agree with the defendant, however, that evidence of this sort of testing is required under the fifth *Hanson* criterion. Because the fourth *Hanson* criterion calls for verification of the input speed of the patrol car, a procedure which involves visual comparison of the speed as shown on the radar unit with the speed as shown on the patrol car's speedometer, it is more reasonable to consider evidence of the periodic certification of the speedometer under the fourth criterion.

The *Hanson* criteria were drawn in contemplation that the necessary testimony could be supplied by the operating police officer. It would be inconsistent with this goal to require testimony calling for substantial expertise in the technical inner workings of a radar detection device.

Thus the requirement in the fifth *Hanson* criterion that the radar device be expertly tested is satisfied if the operating officer tests the accuracy of the device using suggested methods as required in the second *Hanson* criterion. Trooper Due testified to having tested the unit both before and after the defendant's arrest, using both the device's own internal calibration mechanism and two external tuning forks. Using these well-recognized methods for determining the accuracy of the radar device, Trooper Due ascertained both before and after the arrest that the device was functioning properly. We believe that these tests are sufficient to raise the rebuttable presumption that the radar device was functioning accurately. *See, e.g., State v. Primm,* 4 Kan. App.2d 314, 606 P.2d 112 (1980).

The defendant next argues that the external tuning fork test does not meet the requirement in *Hanson* that the test be accomplished by means which do not rely upon the unit's internal calibrations. This argument misperceives the thrust of the fifth *Hanson* requirement. In *State v. Gerdes,* 291 Minn. 353, 191 N.W.2d 428 (1971), the Minnesota Supreme Court reversed a radar speeding conviction because the operating police officer had tested the radar device only by using the device's built-in calibration mechanism. The court concluded that "[t]o test the machine by the machine itself seems to be bootstrapping." *Id.* at 431. This is the danger which is sought to be avoided by the requirement that the radar device be tested by some external means. *But see: People v. Flaxman,* 74 Cal. App.3d Supp. 16, 23–24, 141 Cal. Rptr. 799 (1977). Thus the requirement would not have been satisfied had Trooper Due used only the device's internal calibration system. The external tuning forks do not rely on the radar device's own calibrations but rather upon the calibrations of the particular tuning forks used.

This raises the defendant's final contention which is that under the fifth *Hanson* criterion there should be some evidence that the tuning forks used for the external tests were themselves accurate. Some jurisdictions have imposed such a requirement upon the prosecution in proving the reliability of the radar unit. *State v. Bollinger*, 550 S.W.2d 214 (Mo. App. 1977); *Biesser v. Town of Holland*, 208 Va. 167, 156 S.E.2d 792 (1967). Two jurisdictions require proof of the accuracy of the tuning fork if only one fork is used but require no such proof if two forks are used. *State v. Readding*, 160 N.J. Super. 238, 389 A.2d 512 (1978); *People v. Walker*, 610 P.2d 496 (Colo. 1980). The greater weight of authority holds that, where external tuning forks have been used to ascertain the accuracy of a radar speed device, additional proof of the accuracy of the tuning forks is not necessary. *State v. McDonough*, 302 Minn. 468, 225 N.W.2d 259 (1975); *State v. Overton*, 135 N.J. Super. 443, 343 A.2d 516 (1975); *State v. Shimon*, 243 N.W.2d 571 (Iowa 1976).

Here Trooper Due, the operating officer, employed two tuning forks designed to test the radar device at two different speeds. The risks relative to tuning fork inaccuracy were minimized, as it is unlikely that the radar device and both tuning forks would be inaccurate to precisely the same extent. To require proof of accuracy of a tuning fork by still some other testing device would create a sequence of tests to verify tests which raises the same proof problem at each level. There must be a point in the sequence at which the accuracy of a test device is accepted. The presumption of accuracy which *Hanson* accords radar speed detection devices does not require proof of the accuracy of a tuning fork used to test them.

It should also be noted that the fourth *Hanson* criterion requires the operating officer to verify the patrol

car's input speed by using the radar device's verification mechanism. The officer can then visually compare the vehicle's speed as measured by the radar device with the speed as registered on the vehicle's speedometer. This procedure is another check on the accuracy of the radar device which is particularly important because it is conducted while the vehicle is actually moving.

The defendant's arguments indicate a substantial misunderstanding of the fifth *Hanson* criterion. The testing of the radar device and the means employed in the testing are those generally contemplated in criteria one and two. The fifth criterion should be viewed chiefly as establishing a reasonable time frame following the arrest for such testing to be conducted. Compliance with the requirement that the device be tested within a reasonable time following the arrest reduces the possibility that the test results will be remote and therefore of diminished probative value, and when coupled with the second *Hanson* criterion, it establishes a pre- and post-testing procedure which should minimize the possibility of inaccurate radar readings. In this case Trooper Due tested the device about an hour prior to the arrest and then about twelve minutes after the arrest. We do not establish precise time limitations within which these tests must be conducted, but the tests which Trooper Due conducted shortly following Kramer's arrest were clearly done within a reasonable time following the arrest.

We conclude that the fifth criterion of *Hanson* was satisfied in this case and that the decision of the court of appeals should be affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.