STATE of Minnesota, Respondent,

v.

**Noor Mohamed ALI, Appellant.**

**No. A03–806.**

Court of Appeals of Minnesota.

May 11, 2004.

Mike Hatch, Attorney General, St. Paul, MN and Jay M. Heffern, Minneapolis City Attorney, Marcia A. Johnson, Assistant City Attorney, Minneapolis, MN, for respondent.

Stephen V. Grigsby, Minneapolis, MN, for appellant.

Considered and decided by PETERSON, Presiding Judge, LANSING, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge.

Appellant challenges his conviction of speeding, arguing that the evidence is insufficient to support the conviction and the district court erroneously admitted the results of a laser-based speed-measuring device. Because we conclude that the laser evidence was properly admitted, and that the laser reading and the officer's observations are sufficient to support appellant's conviction, we affirm.

## FACTS

On March 2, 2003, Officer Jerry Johnson of the Minneapolis Police Department was on duty near the intersection of Hennepin and Wilder in Minneapolis. The posted speed limit in the area is 30 mph. Officer Johnson noticed two vehicles approaching and observed that the vehicle in the center lane was overtaking the vehicle in the left lane. In order to verify his visual perception that the vehicles were speeding, Officer Johnson measured the speed of both vehicles with a Kustom Pro Laser III speed-measuring device. Officer Johnson determined that the vehicle in the left lane was traveling at 37 mph, while the vehicle

in the center lane, driven by appellant Noor Mohamed Ali, was traveling 41 mph. Officer Johnson then stopped appellant and issued him a speeding ticket.

Officer Johnson was the only witness to testify at trial. In addition to explaining the events of March 2, Officer Johnson told the court that he has been employed in the traffic division of the Minneapolis Police Department for 17 years, where he routinely investigates accidents and enforces traffic laws. Officer Johnson is certified to use laser devices. In 1990, he received training in Arizona to become a laser instructor and received additional instructor's training in 1994 through a laser manufacturer. Officer Johnson has been the laser instructor for the Minneapolis Police Department since 1990.

Officer Johnson testified that the laser unit he used on March 2 is tested annually to ensure that it meets the manufacturer's specifications for output and detection and to make sure it can "clock" moving vehicles accurately. Laser testing is conducted by the police department's radio shop; once a laser passes the tests, the department issues a Certificate of Testing and Accuracy in its ordinary course of business. The laser used by Officer Johnson on March 2 was certified in May 2002, which indicated that it had passed all the necessary tests, including the Scope Alignment Test, Display and Integrity Test, Fixed Distance Test, and the Delta Distance Velocity Test. Although appellant repeatedly objected to admission of this document on the bases of hearsay, lack of foundation, and unreliability, the court admitted the certificate into evidence.

Additionally, Officer Johnson testified how he routinely tests the laser devices on the same day that they will be used. Officer Johnson explained:

First thing I do is I turn the unit on. It goes through a series of internal checks, checking both the internal computer, which converts changes and distance to speeds, and collects all the lighting dial out segments to make sure [the laser is] lighting up correctly....

And then I, we have a course set up in our garage which we've measured out with steel engineering tapes with two different distances. We go through what's called a Delta Distance Check, or Difference Test. Because the basic theory of separation for the laser is to determine speeds based on changes in distance over time, using the speed of light as a basis.

So we aim it at the first measurement, get that measurement, make sure it measures it what the steel tape measures it out. Second measurement, and make sure it gets the same measurement it was supposed to, and then we push a button, puts it in the mode which will determine the difference between those two and simulate a speed based on the doubling of that distance. If it passes that test, [we] use the [S]cope [A]lignment [T]est to make sure there's actually a red dot in the scope that you look through. It projects the dot on the vehicle, just like a rifle scope, and make sure the red dot is aligned properly with the laser beam that comes out. And one additional test that's not even required but [we] do it as a part of course, the Zero Velocity Test. Aim it at a known point in regular speed mode and make sure it gets that distance, giving you a speed, to know it's not going to detect or simulate movement on something that's not moving.

Officer Johnson later explained the Scope Alignment Test in more detail, stating:

I ... put it in the range mode which gives, instead of pulsed light energy, it gives it steady light energy. And then I aim it at a narrow pipe about ... two

inches in diameter at the end of the garage. And when it pass[es] over that pipe, you'll hear a change in tone if the laser beam is striking the pipe at the exact same time as your dot moves over it. I do that both horizontally and vertically for wind and elevation and make sure it's on the exact spot where it's supposed to be.

Officer Johnson stated that it is the department's practice for officers to record the results of these tests at both the beginning and end of the officer's shift. The log sheet for March 2 was admitted into evidence over appellant's hearsay objection. The log indicates that the laser was tested and was working properly at both the beginning and the end of Officer Johnson's shift.

Finally, Officer Johnson testified that he received training in 1978 on how to visually estimate the speed of a moving vehicle. He can accurately estimate the speed of a vehicle traveling at 30 mph, 50 mph, and 65 mph, within five mph. The laser's indication of 41 mph was consistent with Johnson's visual observation of the speed of appellant's vehicle. Officer Johnson also testified that he measured the speeds of numerous other vehicles on March 2, and the laser was consistent with his visual observations of the speed of those vehicles. Officer Johnson explained that

[t]he laser merely is used as a tool to verify my visual impressions and give me an actual number to put on paper here. I mean, as a driver, as a police traffic officer for a number of years, certainly a skill I've learned is to look at vehicles and determine which ones appear to be speeding.

After considering the testimony and the arguments of both parties, the district court found appellant guilty of speeding and imposed a fine. The court stated on the record:

I find that Officer Johnson's testimony is credible with respect to the fact that he's trained in determining speeds visually, that he observed [appellant] to be driving the vehicle which he believed to be driven in excess of the speed limit somewhere around 41 miles per hour, that he then used the laser [which] . . . indicated it was 41 miles per hour. I also take note that, of course, the speed limit was 30 miles per hour. If this was a case in which Officer Johnson was here saying it was 31 miles per hour that [appellant] was going, maybe the arguments would be more persuasive; however, on the fact 11 miles per hour gap there, I find Officer Johnson's testimony credible.

This appeal follows.

## ISSUES

1. Did the district court abuse its discretion by taking judicial notice of the reliability of evidence from a laser-based speed-measuring device?

2. Does Minn.Stat. § 169.14, subd. 10(a), (b) (2002), violate the separation-of-powers doctrine?

3. Did the district court abuse its discretion by admitting the laser reading establishing appellant's speed on March 2, 2003?

4. Did the district court abuse its discretion by admitting the Certificate of Testing and Accuracy?

5. Is Officer Johnson's visual estimate of appellant's speed sufficient to support the conviction?

## ANALYSIS

Appellant contends that the evidence is insufficient to support his conviction for speeding on the grounds that (1) the laser-device evidence was erroneously admitted and (2) Officer Johnson's visual observa-

tions alone cannot support the verdict. In considering a claim of insufficient evidence, this court reviews the record to determine whether the evidence, when viewed in the light most favorable to the conviction,· is sufficient to allow the court to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). We will not disturb the verdict if the district court, acting·with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988).

When reviewing a district court's evidentiary rulings, this court looks "at the record as a whole to determine whether, in light of the evidence therein, the district court acted arbitrarily, capriciously, or contrary to legal usage." *State v. Profit*, 591 N.W.2d 451, 464 n. 3 (Minn.1999) (quotation omitted). Evidentiary rulings rest within the sound discretion of the district court, and will not be reversed absent an abuse of that discretion. *State v. Smith*, 669 N.W.2d 19, 26 (Minn.2003).

## 1. Judicial notice of the reliability of laser technology.

 Appellant argues that "[t]he admission of the laser device without sufficient evidence of its reliability by a qualified expert amounts to a judicial noticing of the device's reliability," in violation of Minn. R. Evid. 201. While we do not agree that the court took judicial notice of the laser's reliability in this case, even if it had, there would be no abuse of discretion. In *State v. Gerdes*, 291 Minn. 353, 191 N.W.2d 428 (1971), the Minnesota Supreme Court held that district courts could take judicial notice of the reliability of radar. *Id.* at 354, 191 N.W.2d at 429. The court stated:

We are in accord with the authorities which accept the reliability of radar speedometers where there is evidence they were operated by trained personnel who have adequately tested the accuracy of the particular device by which the defendant's speed was determined. Consequently, we hold that it was proper for the trial court to take judicial notice of the reliability of radar as a means of establishing speed without requiring the operated to be qualified as an expert in the field.

*Id.* at 356, 191 N.W.2d at 430–31. This court has cited the *Gerdes* holding on several occasions. *See, e.g., State, City of St. Louis Park v. Bogren*, 410 N.W.2d 383, 385 (Minn.App.1987) (stating that "[r]adar is accepted as a reliable measure of speed when there is evidence of proper testing and operation by trained personnel"); *State v. Dow*, 352 N.W.2d 125, 126–27 (Minn.App.1984) (stating that "[r]adar speedometer results are reliable if the unit is properly tested and operated"). By analogy, so long as there is adequate evidence that a laser-based speed-measuring device used to support a conviction has been tested for accuracy and that officers using the device have been trained in its use, a district court does not abuse its discretion by taking judicial notice of the device's general reliability of laser technology.

## 2. Constitutionality of Minn.Stat. § 169.14, subd. 10 (2002).

 Minn.Stat. § 169.14, subd. 10(a), (b), sets forth the requirements for admitting evidence from a radar or other "speed-measuring device" to show that a defendant was speeding. The statute provides:

(a) In any prosecution in which the rate of speed of a motor vehicle is relevant, evidence of the speed as indicated on radar or other speed-measuring de-

vice is admissible in evidence, subject to the following conditions:

(1) the officer operating the device has sufficient training to properly operate the equipment;

(2) the officer testifies as to the manner in which the device was set up and operated;

(3) the device was operated with minimal distortion or interference from outside sources; and

(4) the device was tested by an accurate and reliable external mechanism, method, or system at the time it was set up.

(b) Records of tests made of such devices and kept in the regular course of operations of any law enforcement agency are admissible in evidence without further foundation as to the results of the tests. The records shall be available to a defendant upon demand. Nothing in this subdivision shall be construed to preclude or interfere with cross examination or impeachment of evidence of the rate of speed as indicated on the radar or speed-measuring device.

Minn.Stat. § 169.14, subd. 10(a), (b).

■ Appellant contends that Minn.Stat. § 169.14 (2002) is unconstitutional, asserting that it violates the separation-of-powers doctrine because the legislature has removed the judiciary's power to regulate evidentiary matters. A statute is presumed to be constitutional, and a court's power to declare a statute unconstitutional is exercised "with extreme caution and only when absolutely necessary." *State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998) (quotation omitted).

■ While the power to establish rules of evidence lies within the inherent authority of the judiciary, *State v. Willis*, 332 N.W.2d 180, 184 (Minn.1983), courts have nevertheless enforced "reasonable statuto-ry rules of evidence as a matter of comity where the rules were not in conflict with the Minnesota Rules of Evidence." *State v. Larson*, 453 N.W.2d 42, 46 n. 3 (Minn. 1990). Therefore, the statute may set guidelines for the admissibility of evidence from a speed-measuring device without violating the separation-of-powers doctrine so long as it does not conflict with the rules of evidence. *See State v. McCoy*, 668 N.W.2d 425, 427 (Minn.App.2003), *review granted* (Minn. Nov. 18, 2003).

Here, two rules of evidence are analogous: Minn. R. Evid. 402 ("relevant evidence is [generally] admissible") and Minn. R. Evid. 803(6) ("data compilation . . . if kept in the course of a regularly conducted business activity [is admissible] unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness"). Minn.Stat. § 169.14 does not conflict with rule 402, as evidence from a speed-measuring device is certainly relevant in establishing that a defendant was speeding, and none of the exclusionary rules apply. Furthermore, the statute does not conflict with rule 803(6) because the device's readings are routinely written on speeding tickets in the regular course of the police department's business, and there is nothing inherently untrustworthy about the evidence. Therefore, we conclude that because Minn.Stat. § 169.14 complies with, rather than conflicts with, the rules of evidence, it does not violate the separation-of-powers doctrine.

### 3. Admissibility of the results from the laser device used on March 2.

Although the admissibility of evidence from a laser-based speed-measuring device under Minn.Stat. § 169.14, subd. 10(a), is a case of first impression, we conclude that the existing caselaw concerning the admissibility of radar evidence is analogous. For example, in *Dow*, we concluded that

radar evidence was admissible where the officer was a certified radar operator, was familiar with the radar device used, and had checked the accuracy of the radar unit by performing internal and external tests both before and after his shift. 352 N.W.2d at 126. Specifically, we stated that "[t]he external methods, consisting of a tuning fork and a calibrated speedometer on the squad car," were sufficient to satisfy the condition that the device be "tested by an accurate and reliable external mechanism, method, or system at the time it was set up." *Id.* at 127 (quoting Minn. Stat. § 169.14, subd. 10(a)(4)). Likewise, in *State v. Pulos,* we held that the radar evidence was admissible under subdivision 10(a) where the police officer was a certified radar operator who conducted internal and external checks of the radar unit, and all tests indicated that the unit was in proper working order. 406 N.W.2d 75, 76 (Minn.App.1987). Additionally, in *Bogren,* we concluded that radar evidence was admissible where the officer performed external and internal calibration checks both before and after issuing the appellant's ticket, records were introduced verifying the accuracy of both the radar unit and tuning forks used in testing, the officer was certified to operate the radar unit, and there was no evidence of outside interference. 410 N.W.2d at 384–85. The record here demonstrates that the results of the laser device used by Officer Johnson were admissible under Minn.Stat. § 169.14, subd 10(a).

■ While appellant contends that subdivision 10(a)(4) is not satisfied because Officer Johnson "failed to perform an external test of moving objects," there is no requirement in the statute that the laser be tested in any particular manner. Rather, subdivision 10(a)(4) requires only that the device be tested by an "accurate and reliable" external method. The record

shows that several external methods were routinely used to test the Minneapolis Police Department's laser devices, and that those methods were reliable in determining whether the laser was working properly or experiencing accuracy problems. Therefore, subdivision 10(a)(4) has been satisfied, and we reject appellant's argument that a test on moving objects was required. *See Bogren,* 410 N.W.2d at 385 (rejecting appellant's claim that he was entitled to question the city about whether it was licensed by the FCC to operate radar units because section 169.14 does not require evidence of a valid FCC license).

## 4. Admissibility of Certificate of Testing and Accuracy.

■ Appellant also argues that the district court abused its discretion by admitting the Certificate of Testing and Accuracy, claiming that the document was hearsay and not admissible under the business-records exception. *See* Minn. R. Evid. 803(6). Minn.Stat. § 169.14, subd. 10(b), specifically contemplates that "[r]ecords of tests made of such devices and kept in the regular course of operations of any law enforcement agency are admissible in evidence without further foundation as to the results of the tests." Nonetheless, while business records are generally admissible under rule 803(6), "[d]ocuments prepared solely for litigation purposes do not qualify under this exception." Minn. R. Evid. 803(6) 1989 comm. cmt.

Officer Johnson testified that when a laser device passes the appropriate testing, the radio shop issues a certificate of accuracy for police officers to use "for purposes like today," i.e., court proceedings. Officer Johnson also stated that the people who prepare the certificates know that the documents are regularly brought into court. But Officer Johnson also testified that the certification document was created in the

regular course of the department's business to ensure that the laser is accurately measuring speed and meeting the "manufacturer's specifications for the output and detection circuits." Therefore, we disagree with appellant's contention that the certification was prepared "solely for litigation purposes." The comments to rule 803(6) recognize that "[i]f the document is prepared in part for business purposes but with an eye toward litigation the court must decide if the interest in litigation sufficiently detracted from the trustworthiness of the report to preclude its admission." Minn. R. Evid. 803(6) 1989 comm. cmt. Here, the district court specifically found that the document was "reliable" despite appellant's concerns that the department knew it could be used in court proceedings. We conclude that the district court did not abuse its discretion in admitting the certificate under the business-records exception.

■ Appellant also contends that "[e]ven if the business records were properly introduced, [his] confrontations rights . . . were denied by the reception of hearsay to establish an element of the crime." *See State v. Matousek,* 287 Minn. 344, 350, 178 N.W.2d 604, 608 (1970) (recognizing that if business records "are offered to prove an essential element of the crime or connect the defendant directly to the commission of the crime, then they must be proved through persons having personal knowledge of the element or connection and such persons must be available for cross-examination"). But the certificate does not raise confrontation problems because it was not offered to prove an essential element of the crime or to directly connect appellant to the commission of the crime. In *State v. Jensen,* 351 N.W.2d 29, 32–33 (Minn.App.1984), this court concluded that business records establishing that a breathalyzer test was working properly

did not pose a confrontation problem because they were "merely collateral evidence of the reliability of the breathalyzer test." Similarly, in this case, the certification document was admitted only as collateral evidence of the reliability of the tests performed by Officer Johnson. Therefore, we conclude that the certificate was properly received into evidence.

### 5. Officer Johnson's visual observations.

■ Appellant's final argument is that Officer Johnson's visual speed estimation is insufficient to establish that he was speeding. In *Lemieux v. Bishop,* 296 Minn. 372, 378, 209 N.W.2d 379, 383 (1973), the supreme court recognized that the estimation of "the speed of an automobile lies in a field in which a lay person gifted with reasonable intelligence, given a fair opportunity to observe, and having ordinary experience with moving vehicles may give opinion testimony." Beyond having this type of "ordinary experience," Officer Johnson testified that he was trained in 1978 to accurately estimate the speed of a moving vehicle within five mph, and that he has perfected that skill over the past 25 years. The laser's indication of 41 mph for appellant's speed was consistent with Johnson's visual observation; the laser was also consistent with Johnson's visual estimates of the speed of other vehicles that day. Officer Johnson explained that "[t]he laser merely is used as a tool to verify my visual impressions." Based on this record, we agree with the district court's conclusion that "Officer Johnson's testimony is credible with respect to the fact that he's trained in determining speeds visually [and] that he observed [appellant] to be driving the vehicle . . . in excess of the speed limit somewhere around 41 miles per hour."

Appellant also raises concerns that the district court entertained reasonable doubt by stating, "[i]f this was a case in which Officer Johnson was here saying it was 31 miles per hour that [appellant] was going, maybe the arguments would be more persuasive; however, on the fact 11 miles per hour gap there, I find Officer Johnson's testimony credible." But the state was required to prove only that appellant was exceeding the speed limit, not that he was driving 41 mph. *See State v. Aanerud*, 374 N.W.2d 491, 492 (Minn.App. 1985). In *Aanerud*, the district court found the appellant guilty of speeding, stating, "there was reasonable doubt that [the appellant] was going fifteen miles per hour over the speed limit but there can be no doubt that he exceeded the limit by some amount." We affirmed, reasoning that

> [t]he court could have found that there was a margin of error in the radar unit's readout, which would have meant that [the appellant's] car was traveling either somewhat less or somewhat more than 45 mph [in a 30 mph zone]. This would have been sufficient to raise the reasonable doubt stated by the court without the total discrediting of the reading urged by appellant.

*Id.*

Here, Officer Johnson's visual estimate was consistent with the laser's determination that appellant was traveling 41 mph. Even if we presume a five mph margin of error, the testimony still demonstrates that appellant was traveling at least 36 mph. Therefore, Officer Johnson's visual estimate alone is sufficient to establish that appellant exceeded the 30 mph speed limit.

## DECISION

Although we disagree that the district court took judicial notice of the general reliability of laser technology, we conclude that where there is adequate evidence of the testing of the laser device and the training of the officer using the device to support the conviction, judicial notice is appropriate. Furthermore, we conclude that because Minn.Stat. § 169.14, subd. 10(a), (b) (2002), does not conflict with the rules of evidence, it does not violate the separation-of-powers doctrine and is, therefore, constitutional. Additionally, we conclude that the district court did not abuse its discretion by admitting the laser reading establishing appellant's speed on March 2, 2003, under Minn.Stat. § 169.14, subd. 10(a), as the record demonstrates that Officer Johnson was trained to use the laser device and that the device was routinely tested for accuracy by reliable internal and external methods. We also find no abuse of discretion in the district court's admission of the Certificate of Testing and Accuracy under the business-records exception, as the record demonstrates that the certificate was reliable and was not prepared solely for litigation purposes. Finally, we conclude that Officer Johnson's visual estimate of appellant's speed was alone sufficient to support his conviction for speeding.

**Affirmed.**